Capps v. Blondeau, 2010 NCBC 7.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
07 CVS 16486

MARTHA B. CAPPS, by and through her )
Guardian ad Litem, Bruce L. Capps, )
                 Plaintiff )
                  )
          v. )
                  )
HAROLD EARL BLONDEAU; R.J. )
BLONDEAU; NEAL WILLIAM KNIGHT; )
ANNE LOUISE KNIGHT; HELEN )
SOUTHWICK KNIGHT; MORGAN )
KEEGAN & COMPANY, INC.; MARVIN L. )
BAKER FAMILY FOUNDATION, INC. and )
REGIONS BANK, d/b/a REGIONS )
MORGAN KEEGAN TRUST FSB, )
              Defendants )

**ORDER ON MOTIONS TO STAY
JUDICIAL PROCEEDINGS AND
TO COMPEL ARBITRATION**

THIS CAUSE, designated a complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, by order of the Chief Special Superior Court Judge for Complex Business Cases, now comes before the court for determination of motions to stay judicial proceedings and to compel arbitration (the "Motion(s)") propounded in this matter by Defendants Harold Earl Blondeau ("Blondeau") and Morgan Keegan & Company, Inc. ("Morgan Keegan") (collectively, the "Defendants"), pursuant to G.S. 569.7 (a) and 569.7(g); and the provisions of Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6), North Carolina Rules of Civil Procedure ("Rule(s)"); and

THE COURT, having considered the Motions, the arguments and briefs in support of and in opposition to the Motions, and appropriate matters of record, CONCLUDES that the Defendants' Motions should be DENIED for the reasons stated herein.

I.

PROCEDURAL HISTORY

[1]     On October 12, 2007, Martha B. Capps ("Capps"), through her Guardian ad Litem, Bruce L. Capps, filed this civil action against the moving Defendants, and others, alleging misconduct in connection with her assets.  The original verified Complaint subsequently was amended pursuant to Order dated April 30, 2008.[1]

[2]     Against Defendant Blondeau, Capps alleges Claims of (a) Breach of Fiduciary Duty — First Cause of Action; (b) Constructive Fraud, pled in the alternative — Second Cause of Action; (c) Fraud and Deceit, pled in the alternative — Third Cause of Action; (d) Negligent Misrepresentation — Seventh Cause of Action; (e) Violation of North Carolina Racketeer Influenced and Corrupt Organizations Act, G.S. 75-D — Tenth Cause of Action; (f) Civil Conspiracy — Eleventh Cause of Action and (g) Unfair and Deceptive Trade Practices — Thirteenth Cause of Action.

[3]     Against Defendant Morgan Keegan, Capps alleges Claims of (a) Negligent Misrepresentation — Seventh Cause of Action; (b) Respondeat Superior/Vicarious Liability — Eighth Cause of Action; (c) Negligence and/or Negligence Per Se — Ninth Cause of Action and (d) Unfair and Deceptive Trade Practices — Thirteenth Cause of Action.

---

[1] As amended, the Complaint contains some ninety-six pages having 294 paragraphs, with subparagraphs, and alleging twenty-two Causes of Action ("Claims").

[4]     Capps also seeks remedies against other non-moving Defendants.  The non-moving Defendants do not contend they are parties to any arbitration agreements between them and Capps, and they are unaffected by the Motions.  There are extant motions pursuant to Rule 12(b)(6) to dismiss certain of Capps' Claims.  Those motions have been addressed in a separate Order.

[5]     On January 7, 2008, Morgan Keegan filed its Motion, based on Capps' alleged execution of a customer agreement with Morgan Keegan that contained mandatory arbitration provisions.  On the same day, Blondeau filed a Memorandum of Law in Support of His Motion to Compel Arbitration.[2]  Thereafter, Capps asked the court to permit discovery related to arbitration and the merits.  On May 2, 2008, the court entered an Order permitting the parties to conduct discovery limited to "the issues of (a) whether a valid agreement to arbitrate exists, and if so (b) whether the agreement is unconscionable."[3]

[6]     On May 5, 2008, Capps filed her amendment to the Complaint.  In her original Complaint, Capps included several allegations to the effect that an agreement existed between her and Morgan Keegan that contained a mandatory arbitration provision.  In the original Complaint, Capps contended, on various grounds, that the arbitration provisions should not be enforced with regard to the disputes raised in this

---

[2] Blondeau filed another document captioned as being a memorandum of law in support of the same motion.  However, it is apparent that the first filing was captioned erroneously, and in substance was Blondeau's actual motion to compel arbitration.
[3] Order, May 2, 2008, 4-5.

civil action.[4]  In her amendment to the Complaint, Capps disputes the authenticity of any alleged arbitration agreement between her and Morgan Keegan.[5]

[7]     On April 2, 2009, the court issued a new briefing schedule on the Motions. The parties have propounded evidence and arguments in support of and opposition to the Motions, and the Motions are ripe for determination.

II.

FACTUAL BACKGROUND[6]

[8]     The Motions raise the issue of whether Capps entered into an agreement with Morgan Keegan subjecting her to the use of binding arbitration procedures to resolve any disputes with Morgan Keegan or its agents; and if so, whether such an agreement is enforceable in the context of this civil action.

[9]     In 1988, Capps, a resident of North Carolina,[7] learned that she would be the principal beneficiary of her aunt Anne Kyle's ("Kyle") multimillion dollar estate.[8] Kyle, a resident of Palm Beach, Florida, had inherited a large estate from her late husband.  Capps was Kyle's closest family member and provided Kyle with friendship and comfort for many years prior to Kyle's death.  In anticipation of Kyle's death, and upon professional advice, Kyle established two trusts under Florida law, the Anne Kyle GST and the Anne Kyle Irrevocable Trust (collectively, the "Trusts").  Blondeau and others were closely involved in advising Capps with regard to the Trusts.

---

[4] Original Compl., ¶¶ 274-89, and prayer, ¶ 15.
[5] Amended Compl., ¶¶ 274-94 (further references to the Complaint as amended will be to "Complaint," unless otherwise noted).
[6] Most of the alleged facts reflected in this Order are not in dispute.  However, in determining the threshold issue of whether a mandatory arbitration agreement exists, the court necessarily must sit as a finder of fact.  Accordingly, for such limited purpose, the court also may consider evidence as to facts that are in dispute.  *Slaughter v. Swicegood*, 162 N.C. App. 457, 461 (2004).
[7] Compl., ¶ 1.
[8] *Id.*, ¶¶ 19-20.

[10]     From at least 1988 and up until the events complained of in the Complaint, Blondeau was Capps' financial and investment advisor.  During those years, she reposed trust and confidence in his advice.  In the early part of their relationship, Blondeau was employed by the investment firm A.G. Edwards.

[11]     After Kyle's death in 1989,[9] the Trusts were funded as anticipated.[10] Blondeau's then employer, A.G. Edwards, served as successor trustee of the Trusts from 1989 until 1997.[11]  Thereafter, Blondeau left his employment with A.G. Edwards and joined Morgan Keegan as a partner.  He advised Capps to move her accounts and the administration of the Trusts to Morgan Keegan.  She did so, and Morgan Keegan was appointed successor trustee of the Trusts.  Eventually, Regions Bank, d/b/a Regions Morgan Keegan Trust FSB, ("Regions Bank") became the successor trustee of the Trusts.[12]   As Capps' broker, Blondeau had a personal and pecuniary interest in having Capps' investment account moved to Morgan Keegan and her multimillion dollar discretionary support trust moved to Morgan Keegan's sister company, Regions Bank.[13]

[12]     In this civil action, Capps has alleged that certain stocks and securities held as Trust assets were transferred improperly to her personal account at Morgan Keegan.[14]  She has further alleged that monies from the liquidation of her stocks and securities at Morgan Keegan later unlawfully were wire-transferred directly from her account to a bank account owned by the Martin L. Baker Family Foundation, Inc. (the

---

[9] Compl., ¶ 28.
[10] Plaintiff alleges the Trusts then contained total assets of approximately four million dollars ($4,000,000).  *Id.*, ¶ 36.
[11] *Id.*, ¶ 35.
[12] *Id.*, ¶ 41.
[13] Pl.'s Br. Effect of Guilty Plea, 7.  *See also* Ex. A, Blondeau's  Resp. to RFA's, 5 (Q/A 23).  *But see* MK's Br. Re: Effect of Blondeau's Guilty Plea, 4 ("[S]tock brokers . . . receive compensation for trades, not advice.").
[14] Compl., ¶ 57.

"Foundation"), a Florida non-profit charitable foundation,[15] on the order of and at the direction of Blondeau.[16] Capps further alleges that Blondeau and others purposefully and unlawfully used and converted her assets for their own personal purposes, in violation of numerous duties owed to her.

[13]    In support of the Motions, Morgan Keegan contends that in 1997 Capps signed a written client agreement that contains a binding arbitration provision relative to any disputes that may arise between Capps and Morgan Keegan or its agents.[17] Morgan Keegan offered as an exhibit a two-page document purporting to be the written agreement (hereinafter, "Exhibit A").

[14]    Exhibit A appears to be one document; however, each page contains a separate form name, Form 40 and Form 20, respectively.[18] Morgan Keegan explained this discrepancy as a simple error of combining these two forms into one document.[19]

[15]    Notwithstanding this discrepancy, Morgan Keegan argues that it required every new customer to execute a client agreement in order to open an account, presumably one that contains both Forms 20 and 40.[20] It contends that a customer like Capps who came to Morgan Keegan with her broker was provided (either by mail or hand delivery) with a previously prepared package including (a) a cover letter, (b) an

---

[15] *Id.*, ¶ 12.

[16] *Id.*, ¶ 59. Capps alleges that Neal Knight has been and is the vice president and registered agent of the Foundation. *Id.*, ¶ 12, Ex. G. She also alleges that Blondeau is the president of the Foundation and keeps the books and records of the Foundation at his personal home in Raleigh, Wake County, North Carolina. *Id.* Capps believes that Blondeau incorporated the Foundation, and Neal Knight drafted and prepared the Foundation's Articles of Incorporation. *Id.*, ¶ 56, Ex. G.

[17] *See*, e.g., Def. MK Br. Supp. Mot. Stay Compel Arb., 3, citing Ex. A.

[18] *Id.* The first page, dated April 1, 1997, includes the description "FORM # 00040 (REV. 9/06)." In contrast, the second page, which is not dated, includes the description "FORM # 00020 (REV. 1/06)." Capps included these two pages as Exhibit O in her Original Complaint. *See also* Def. MK 2nd Br. Supp. Mot. Stay Compel Arb., 5-6. (Some matters may be referenced herein from documents filed under seal. To the extent that is the case, the court deems those matters to be appropriate for publication.)

[19] *Id.*, n. 5.

[20] Def. MK Br. Supp. Mot. Stay Compel Arb., 3.

"ACAT" instructing the former brokerage to move the account, (c) a cash account agreement ("Form 20") and (d) an MOR Account agreement ("Form 40").[21]

[16]    The first page of Exhibit A is labeled as Form 40 ("Exhibit A Form 40 Signature Page").[22]  This page contains Capps' supposed signature.

[17]    Morgan Keegan says it scanned the Exhibit A Form 40 Signature Page and destroyed the original of the entire document within thirty to ninety days of scanning.[23]  However, it has offered a "specimen copy" of the Form 40 it contends was in use at the time Capps would have signed it.[24]  The language of the fifth paragraph of the specimen copy, an arbitration provision, is identical to that of the same numbered paragraph on the Exhibit A Form 40 Signature Page.[25]  However, the form name on the specimen, "FORM #00040 (REV. 9/96),"[26] is located at the bottom of the page while the same name is located at the top of the Exhibit A Form 40 Signature Page.[27]  Moreover, the non-signature page of a Form 40 ostensibly executed shortly before the specimen Form 40, and submitted by Morgan Keegan, contains an additional paragraph, and the language within paragraph thirty-five is different from one document to the other.[28]

---

[21] Def. MK 2nd Br. Supp. Mot. Stay Compel Arb., 4, citing Ex. B (Morgan Keegan's Answers to Plaintiff's Arbitration-Related Interrogatories, 10-12, and Pace Dep. 207: 3-24).  The documents provided to the court do not reveal the meaning of these acronyms.  The court's research suggests the meaning of "ACAT" is "automated customer account transfer."  *See* http://www.dtcc.com/products/cs/equities_clearance/acats.php, last accessed March 29, 2010.

[22] *See* n. 18, *supra*.

[23] Def. MK 2nd Br. Supp. Mot. Stay Compel Arb., p. 6, citing Pace Dep., 184:9-22.  *See also* Morgan Keegan's Answers to Pl. Arb.-Related Interrogs., 11 (suggesting the time frame was 30 days).  While these time frames should be consistent, the court does not find this discrepancy to be material.

[24] Stroud Aff., Ex. A.

[25] Stroud Aff., Ex. A.

[26] *See id.*; Capps Dep., Ex. 4.

[27] Def. MK Br. Supp. Mot. Stay Compel Arb., Ex. A-1.  *See also* Pl. Resp. Br. Opp. Mot. Stay Compel Arb., Ex. A.

[28] *See* Zaytoun Aff., Ex. C-3 (specifically, Ex. C 000010).  There is no date on the signatory page of this Form 40.  However, several documents included as part of the C-3 exhibit are dated March 24, 1997.  As such, the court assumes for purposes of this analysis that the Form 40 submitted with the Zaytoun Affidavit was signed on the same date.

Consequently, a duplicate of the Form 40 arbitration agreement does not exist because the differences between the specimen copy and the signed Form 40 demonstrate the documents are not identical.

[18]     The second page of Exhibit A ("Exhibit A Form 20 Signature Page") is labeled as Form 20.[29]  This page contains Capps' supposed signature.  Immediately above Capps' supposed signature is a provision that reads: "THE UNDERSIGNED ACKNOWLEDGES THAT THE UNDERSIGNED HAS RECEIVED A DUPLICATE OF THIS AGREEMENT; AND THAT THIS AGREEMENT CONTAINS A BINDING AND ENFORCEABLE PREDISPUTE ARBITRATION PROVISION IN PARAGRAPH 5 ON PAGE 1 HEREOF."[30]

[19]     Morgan Keegan says it also scanned the Exhibit A Form 20 Signature Page and destroyed the original of the entire document after scanning.[31]  However, it has offered a "specimen copy" of the form.[32]  This specimen copy also includes the description, "Form #00020 (Rev. 1/06)" and the same acknowledgement sentence.[33]  However, the spacing and fonts of the Form 20 specimen copy are different from those of the Exhibit A Form 20 Signature Page.[34]  Consequently, a duplicate of the Form 20 agreement does not exist because the differences between the specimen copy and the signed Form 20 demonstrate the documents are not identical.

[20]     Capps argues that such discrepancies among Morgan Keegan's client forms dictate a conclusion that Morgan Keegan has not met its burden of proving that

---

[29] *See* n. 18, *supra.*
[30] *Id.  See also* Capps Dep., Ex. 3.
[31] Def. MK 2nd Br. Supp. Mot. Stay Compel Arb., 6, citing Pace Dep., 184:9-22.  *See also* Morgan Keegan's Answers to Pl. Arb.-Related Interrogs., 11.
[32] Stroud Aff., Ex. A.
[33] *Id.*
[34] Pl. 2nd Resp. Br. Opp. Mot. Comp. Arb., 9.

she signed an arbitration agreement.[35]  Morgan Keegan contends these differences are immaterial because (a) the Exhibit A Form 20 Signature Page references an arbitration provision, [36] (b) the Exhibit A Form 40 Signature Page contained an arbitration provision, (c) the arbitration provision did not change[37] and (d) a branch manager would not have had the authority to change the arbitration agreement.[38]  Defendants say that no deviations from this arbitration provision have ever been permitted for public customers like Capps.[39]

[21]    Through the depositions of James Ritt, General Counsel for Morgan Keegan, and John Pace, its branch manager for the Raleigh, North Carolina office, Morgan Keegan offered evidence that at times material its routine practice was to scan an electronic image only of the signature pages of client agreements and thereafter destroy the original signature page and all other pages of the agreement.[40]  An administrative assistant would maintain a form file containing specimens of the customer forms historically used by Morgan Keegan in an unlocked file cabinet.[41]  Such forms would include an identical, blank, hard copy of each client agreement, excluding the signature page.[42]  The form client agreements reflect form numbers and revision

---

[35] Pl. Resp. Br. Opp. Mot. Comp. Arb., 13; Pl. 2nd Resp. Br. Opp. Mot. Comp. Arb., 9-11.
[36] Stroud Aff., Ex. A.  *Cf. Dreyfuss v. eTelecare Global Solutions-US Inc.*, 2009 U.S. App. LEXIS 20842 at 4 (affirming district court's denial of employer's motion to compel arbitration, holding (a) the demonstrable differences among the several agreements in the record, where original was missing, established that the employer had not met its burden of proving the existence of a valid arbitration agreement between itself and the employee and (b) evidence of both parties' intent to arbitrate does not constitute a meeting of the minds on all essential terms, a requirement of contract formation).
[37] Pace Dep., 140-44, 147-48; Ritt Dep., 120-21.
[38] Pace Dep., Ex. B, 8.  *See also id.* at 14 ("Blondeau had no discretionary authority over Ms. Capps' account.")
[39] *Id.*, 140-44, 147-48; *Id.*, Ex. B, 8.
[40] Ritt Dep., 28:5-8; 34:8-16; 41:11-16.  *See also* Pace Dep., Ex. B, 11.
[41] Ritt Dep., 99:9-14; 100:1-12; 100-104.  *See also* Pace Dep., Ex. B, 19-20.
[42] *Id.*

dates, and are periodically revised.[43]  Defendants contend that in recent years Morgan Keegan generally has kept a soft, editable copy of the most recent client agreements until the next revision date.[44]

[22]    Morgan Keegan admits it is bound by SEC Rules governing the maintenance of documents,[45] and that it was bound by the SEC Rules as they existed in 1997 when Capps became a client of Morgan Keegan.  Morgan Keegan was then and is now required to have written supervisory procedures reasonably designed to achieve compliance with the rules of the SEC and FINRA.[46]  Morgan Keegan concedes it cannot produce and does not even know of a single written procedure or retention schedule, at either the branch level or corporate headquarters, that memorializes or references its stated practice of scanning signature pages and destroying original client agreements.[47]

[23]    Capps' Complaint denies both the existence of an arbitration agreement and the authenticity of any documents Defendants contend constitute an arbitration agreement.[48]  Defendants argue that notwithstanding Capps' amended Complaint, her

---

[43] Ritt Dep., 106:6-11.

[44] *Id.*, 106:18-107:21.  Capps argues Ritt's statement is inherently unreliable because he testified that despite this fact, "his 'understanding' was that there was no soft, editable copy of the version at issue in this case and he 'thinks' someone retyped everything in hardcopy (*see* 107-108)."  *See* Pl. 2nd Resp. Br. Opp. Mot. Comp. Arb., 8.

[45] Ritt Dep., 30:10-13; 53:14-17.

[46] *Id.*, 14:7-11; 58:1-6.

[47] *Id.*, 54:24-57:19; 89:18-91:3; 177:9-15.  The retention schedule attached as Ritt Dep. Ex. 5 describes a category of documents, "New Account Forms," as "All Forms required when account has been opened." Though Ritt testified that an executed client agreement is a document required before a Morgan Keegan account is opened, he distinguished a New Account Form as separate and distinct from a client agreement.  As such, a client agreement does not fall within the definition of a New Account Form and therefore is not subject to this retention policy.  *See id.,* 81:12-83:2.

[48] Compl., ¶ 282.

original Complaint contains an admission that she agreed to be subject to an arbitration provision.[49]

[24]    Since at least September 2001, Martha Capps experienced a progressive decline in her memory.  By July 2005, she was experiencing problems in remembering her name.[50]  In August 2005, her physician concluded that she had significant cognitive impairment and was not able to make financial or personal decisions.[51]  In September 2005, she was diagnosed with dementia, most likely due to Alzheimer's Disease.[52]  In an October 2005 visit to her physician, she did not know the date, day of the week, month or year; and did not know the name of the President of the United States or the date of her son's birthday.[53]   Notwithstanding this diagnosis, Capps has never been adjudged to be incompetent.[54]  Blondeau was aware of her progressive cognitive decline.[55]

[25]    A review of Capps' deposition testimony reflects that she was experiencing a degree of confusion consistent with her prior diagnosis of progressive dementia.  Defendants point out that she did testify that the signature on the client

---

[49] In the Twentieth through Twenty-Second Causes of Action in her original Complaint, Capps seeks "Rescission of alleged Arbitration Agreement" due to fraudulent inducement, unconscionability and breach of fiduciary duty.  In those causes of action, Capps refers to "the Arbitration Agreement," seemingly not questioning its existence but rather its application.  Capps' amendment to the original Complaint attempts to explain why and how the original Complaint was worded as it was, and argues that any admission contained either directly or inferentially in the original Complaint should be disregarded by the court in deciding the Motions.
[50] Compl., ¶ 122.
[51] *Id.*, ¶ 123.
[52] *See* verified Appl. Aptmnt. GAL, January 22, 2007.  *See also* Affidavit of Todd E. Helton, M.D., Pl. Br. Effect Guilty Plea, Ex. F.  This affidavit was executed within a month of the filing of this civil action in 2007. The affidavit supports the allegations regarding Plaintiff's mental and physical capacity already specifically pled in Plaintiff's Complaint.
[53] Compl., ¶ 127.
[54] In her brief, Capps suggests that she was not competent to testify at her July 24, 2008 deposition.  Pl. 2nd Resp. Br. Opp. Mot. Compel Arb., 12.  G.S. 8C-1, Rule 104 (2009).
[55] Compl., ¶ 141.

agreement was her handwriting.[56]  However, Plaintiff points out that Capps had no recollection of ever before either seeing or signing such a document, and that she exhibited confusion with regard to various matters of everyday living.[57]

[26]    Capps also testified that Blondeau routinely put numerous documents in front of her and told her to sign them, and that she "never read any of the things he wanted [her] to sign" since he "was always pushing [her] to sign it, sign it."[58] Capps testified that Blondeau never discussed documents with her and, in fact, misrepresented the actual purpose of those documents by telling her, among other things, "Martha, I need for you to sign these so I can keep up with your account and all of that stuff."[59] Blondeau testified by affidavit that he did not rush her.[60]  Blondeau also testified that it "was not my general practice to go line-by-line, paragraph-by-paragraph through the client agreement with each new client of Morgan Keegan . . . ."[61]

[27]    Capps used Blondeau exclusively as her broker over the years.[62] He was the person most closely affiliated with Capps with regard to her business affairs during times material.  Her long-standing dependence on and unquestioning trust in Blondeau, in matters both personal and professional, suggests she was a "relatively unsophisticated customer."[63]

[28]    Blondeau has propounded two affidavits, which were relied upon by both moving Defendants.  In the second affidavit, dated February 29, 2008, Blondeau

---

[56] Capps Dep., 42:23-43:13; 45:2-15; 46:17-20 and 47:14-15.
[57] *Id.*, 41:24-42: 20; 42: 23-43:13; 44:10-11 and 45:19-46:4.
[58] *Id.*, 40:17-22; 42:11-13 and 47:11-13.
[59] *Id.*, 38:21-39:06; 40:17-22; 42:11-13; 47:11-13.
[60] Aff. Hal Blondeau, ¶ 6 ("In any case, I have *never* attempted to discourage any prospective client from reading the client agreement.  It is my belief that such a practice is, and would have been, illegal and unethical.").  *See also id.* at ¶¶ 9-10.
[61] *Id.*, ¶¶ 4, 8.  *See also Vail v. Vail*, 233 N.C. 109, 114 (1951).
[62] Pl. 2nd Resp. Br. Opp. Mot. Comp. Arb., 21.
[63] *See*, e.g., Compl., ¶¶ 44-47, 49, 62, 143, 146-48.

testified that he personally completed part, but not all, of the client agreement that Morgan Keegan and Blondeau contend was signed by Capps. In this affidavit, Blondeau testifies that in his opinion, the signature on the client agreement is that of Capps, supporting his opinion by saying that "I have seen the signature of Ms. Capps on numerous other financial documents she executed as a client of Morgan Keegan."[64] It is clear from this affidavit that Blondeau has no direct knowledge of whether Capps signed the client agreement. In his first affidavit, dated January 7, 2008, Blondeau testified as to his "standard practice" in having client documents executed. In this affidavit, Blondeau concedes that he likely did not review the client agreement with Capps prior to its alleged signing. The balance of both the Blondeau affidavits is replete with speculation and assumptions that do not rise to the level of probative evidence.

[29]    Morgan Keegan also relies upon the affidavit of Rebecca Stroud ("Stroud"), a Morgan Keegan administrative assistant, to produce and attempt to authenticate the specimen form agreements allegedly used by Morgan Keegan at the time they contend Capps signed the client agreement.[65] However, Stroud was not employed by Morgan Keegan until 1999, two full years after the 1997 client agreement allegedly was signed.[66] Morgan Keegan also argues that John Pace, the branch manager at Morgan Keegan's office in Raleigh, North Carolina,[67] could authenticate "the Form 40 customer agreement signature page [allegedly] signed by Capps. . . ."[68] However, an examination of the Pace deposition testimony reflects that Pace was

---

[64] 2nd Blondeau Aff., 2.
[65] MK 2nd Br. Supp. Mot. Stay Compel Arb., Ex. E, Stroud Aff.
[66] Pace Dep., 200:5-20.
[67] *Id.*, 5:7-9.
[68] MK 2nd Br. Supp. Mot. Stay Compel Arb., Ex. 12, citing Pace Dep., 172-73.

discussing the Stroud affidavit only.  Accordingly, Morgan Keegan's representation that Stroud and Pace authenticated the signature page is untenable.

[30]    The court takes judicial notice that on April 28, 2009, a Criminal Information ("Information") was filed against Blondeau in the United States District Court for the Eastern District of North Carolina.  Thereafter, in the same court, on June 10, 2009, Blondeau executed a Waiver of Indictment and Consent to Prosecution by Information; and a Plea Agreement (collectively, the "Guilty Plea").[69]  By way of the Guilty Plea, Blondeau was convicted of Investment Advisory Fraud.

[31]    Paragraph 2(a) of the Guilty Plea executed by Blondeau unequivocally states that Blondeau agrees "[t]o plead guilty to Count One and Count Two of the Criminal Information herein."[70] The first introductory paragraph of the Information states that Defendant Blondeau served as the financial and investment advisor for Capps from "at least as early as 1988 through at least February of 2006," which would have been both prior to and at the time of supposed execution of the Morgan Keegan client agreement at issue.

[32]    Paragraph seven of the Information further establishes the fiduciary nature of Blondeau's relationship with Capps, stating that "[t]he essence of the Defendant's scheme to defraud [Capps] was his *abuse of the fiduciary relationship* and position of trust that he had established with [Capps]" (emphasis added).  Count One of the Information, titled Investment Advisor Fraud, incorporates all of the introductory

---

[69] Plaintiff requested, and the Defendants opposed, the court's taking of such notice.  *See* Plaintiff's Request for Judicial Notice ("Request"), filed on July 2, 2009.  The court deems the Guilty Plea documents, and the information they contain, to be appropriate for consideration in the context of the Motions, and accordingly, treats the Request as having been granted.

[70] Mem. Plea Agmt. filed June 10, 2009, *U.S. v. Harold Earl Blondeau*, Case No. 5:09-CR-117, previously attached as "Exhibit C" to Pl.'s Req. Judicial Notice.

paragraphs by reference. Further, paragraph two of Count One itself states that at all times material to the charge Defendant Blondeau was an investment advisor as defined by 15 U.S.C. § 80b-2(a)(11).

[33]   The moving Defendants are unable to produce any witness to Capps' signing of the documents at issue. The only potential witnesses who can offer material evidence regarding the circumstances surrounding the alleged execution of the client agreement are Martha Capps and Defendant Blondeau.

[34]   Capps' own deposition testimony was that the signature looks like hers.[71] This testimony came in a time frame when Capps was confused and suffering progressive dementia and Alzheimer's Disease.[72] The court is concerned about the reliability of Capps' recognition of her signature.

[35]   Blondeau is a convicted felon who has admitted lying to and defrauding Capps. He has admitted that, as described in the Information, he acted in the capacity of an investment advisor to Capps since "at least as early as 1988 through at least February of 2006," almost a decade before the alleged execution of the Morgan Keegan client agreement(s) at issue. Further, Blondeau has admitted that his scheme to defraud Capps was an abuse of his fiduciary relationship and position of trust.

[36]   Blondeau's guilty plea is relevant to the inquiry before the court and is admissible against him in this matter. The argument of judicial notice aside, the conviction properly is considered under Rules 801(d) and 609 of the North Carolina Rules of Evidence as an admission of a party opponent and as impeachment by evidence of conviction of a crime, respectively. Furthermore, the conviction of

---

[71] *See* n. 54, *supra.*
[72] *See* n. 49, *supra.*

defrauding Capps goes directly to Blondeau's character for untruthfulness. The conviction undermines the credibility of his affidavits, and, furthermore, establishes that Blondeau misled Plaintiff's counsel during the arbitration discovery process by virtue of his sworn responses to Plaintiff's Arbitration-Related Requests for Admission that he executed June 18, 2008, a year before his guilty plea.[73]

III.

DISCUSSION

A.

General Principles

[37]    The parties here do not appear to dispute seriously the conclusion that if the appropriate threshold requirements are met, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et. seq.*, would apply to the disputes between Capps and the Defendants that are complained of in this civil action.

[38]    Courts have consistently held that before the FAA becomes applicable to a controversy, the court must be satisfied that (a) a written arbitration agreement exists that covers the dispute and (b) the contract containing the arbitration provision evidences a transaction involving interstate commerce. *Am. Home Assur. Co. v. Vecco Concrete Const. Co. of Va.*, 629 F.2d 961, 963 (4th Cir. 1980); *Willis v. Shearson/American Express, Inc.*, 569 F. Supp. 821, 823 (M.D.N.C. 1983). Capps' Claims against the moving Defendants clearly grow out of her receiving securities advice and services from the Defendants, and such services involving securities brokerage agreements are contracts "involving" interstate commerce. *Park v. Merrill*

---

[73] *See* Blondeau's Resps. Pl.'s Arb.-Related Reqs. Admis. (18-23, 26, and 30).

*Lynch, Pierce, Fenner & Smith, Inc.,* 159 N.C. App. 120, 122 (2003). There does not appear to be a genuine contention by any of the parties here as to satisfaction of the interstate commerce element.

[39] Accordingly, the only remaining threshold requirement for applicability of the FAA is that of whether an arbitration agreement exists between the parties.

[40] The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983).[74]

[41] Section Two of the FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Id.* at 24 (1983). This section provides that a written arbitration agreement in any contract involving interstate commerce is "valid, irrevocable, and enforceable except on grounds that would permit the revocation of a contract in law or equity for the revocation of any contract." *Id.* This section is "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Id.*

[42] Section Three of the FAA does not require an arbitration agreement to be signed. *See Tinder v. Pinkerton Sec.,* 305 F.3d 728, 736 (7th Cir. 2002) ("Although § 3 of the FAA requires arbitration agreements to be written, it does not require them to be signed.").

---

[74] Under the FAA, the party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of that other statute. *Rodriguez de Quijas, et al. v. Shearson/American Express, Inc.*, 490 U.S. 477, 483 (1989).

[43]    However, in resolving the issue of whether there exists a valid written agreement to arbitrate, it is settled that "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445-46 (5th Cir. Texas 2001). (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).[75]

B.

<u>Threshold Requirement of an Arbitration Agreement</u>

[44]    Accordingly, the first analysis this court must make with regard to the Motions is whether, as a matter of North Carolina contract law, a written arbitration agreement exists between Capps and Morgan Keegan.  In opposing the Motion, Plaintiff raises a host of arguments that go beyond this initial determination.  By way of example, she contends that the arbitration clause, if it exists in a written agreement, is procedurally and substantively unconscionable, is an unenforceable contract of adhesion and should be declared void and stricken by the court.[76]   However, the merits of those contentions need not be considered unless there in fact exists a written arbitration agreement between the relevant parties.

[45]    It is well settled in North Carolina that the burden of proving that an arbitration agreement exists is upon the party seeking to compel arbitration.  *Slaughter*

---

[75]  There is no general requirement that an arbitration clause be independently negotiated in North Carolina if it is contained in a contract covering other topics.  *Wilkerson v. Nelson*, 395 F. Supp. 2d 281, 287 (2005).  *But see Blow v. Shaughnessy*, 68 N.C. App. 1, 16, *disc. review denied*, 311 N.C. 751 (1984). In determining whether an agreement to arbitrate is valid, however, the court may only look to general state contract law, not arbitration-specific law.  *Perry v. Thomas*, 482 U.S. 483, 492, n.9 (1987)("Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.  A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with the requirement of [9 USCS] § 2."  (Emphasis in original.)).  *See also Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

[76] Pl. 2nd Resp. Br. Opp. Mot. Comp. Arb., 19-24.

*v. Swicegood*, 162 N.C. App. 457, 461 (2004).  This party must persuade the court, as the finder of fact, that the parties mutually agreed to arbitrate their disputes.  *Id.*; *Thompson v. Norfolk S. Ry. Co.*, 140 N.C. App. 115, 120 (2000); *Routh v. Snap-On Tools*, 108 N.C. App. 268, 271-72 (1992).  The trial court's finding with regard to whether there existed an arbitration agreement is a question of fact, to be determined by the trial court upon competent evidence.  *Id.*  Such a determination is conclusive on appeal, even where the evidence might support findings to the contrary.  *Id.*; *Sciolino v. TD Waterhouse Investor Servs., Inc.*, 149 N.C. App. 642, 645 (2002).

[46]    If the court finds that there existed an arbitration agreement between the parties, it then must determine whether the dispute between them is subject to the arbitration provision.  The latter determination is a question of law for the court, which is reviewable *de novo* on appeal.  *Raspet v. Buck*, 147 N.C. App. 133, 136 (2001).

[47]    An original writing is required to prove the content of a writing, except as otherwise provided in the rules of evidence or by statute.  N.C. Rul. Evid. 1002.  However, a duplicate can be "a counterpart produced . . . by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original."  *Id.*, 1001(4).

[48]    A duplicate may be admitted "to the same extent as an original unless (a) a genuine question is raised as to the authenticity of the original or (b) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  *Id.*, 1003.

[49]    An original writing is not required and other evidence of the contents of a writing is admissible, if the original has been lost or destroyed, as long as the proponent

did not lose or destroy the original in bad faith.  *Id.*, 1004(1).  If failure to produce the

original is satisfactorily explained, secondary evidence is admissible.  N.C. Comm. to

N.C. Rul. Evid. 1004 (quoting the Advisory Committee's Note).[77]  Destroying evidence

in the ordinary course of business generally does not constitute bad faith.[78]  The court is

unaware of any law that suggests failure to follow SEC Rules 17a-3 and 17a-4

constitutes bad faith.[79]

[50]    Specimen copies have been used as secondary evidence to prove the

content of lost policies.  *See, e.g., Vaughn v. Carolina Indus. Insulation*, 183 N.C. App.

25, 31-32 (2007) (rejecting insurer's argument that a missing policy precluded insured

from recovering where insured offered evidence of coverage based on specimen

policy); *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.* 75 F.3d 1048, 1051-52 (5th Cir.

1996) (using specimen policy and other secondary evidence to show coverage).  The

Best Evidence Rule, N.C. Rul. Evid. 1002, only excludes secondary evidence to prove

---

[77] *Cf. Tinley v. Poly-Triplex Techs., Inc.*, 2009 U.S. Dist. LEXIS 23514 ("However, if the secondary evidence consists of a duplicate that would otherwise be inadmissible under Rule 1003 because there is a genuine question as to the authenticity of the original, Rule 1004 'normally should not function as an alternative path to admissibility.'  *See* Wright & Gold, Federal Practice and Procedure, Evidence § 8003 at 410-11 (2000).").

[78] *State v. Shipman*, 202 N.C. 518, 533 (1932)("He further testified that he had 'made diligent search in the files and among my papers for it and have not found it. . . . The natural supposition is that it with other news copy was destroyed.'  He further testified that pieces of news copy are kept two or three weeks and unless there is some question 'We burn it.' The foundation was sufficiently laid for admission of secondary evidence."  The citations following this quote focus on the adequacy of a search for a lost piece of evidence. However, the language itself shows that, by itself, destruction of evidence in the ordinary course of business does not constitute bad faith.).  *See also* 2-10 Brandis and Broun on North Carolina Evidence § 255, n. 43, citing *McAulay v. Earnhart*, 46 N.C. 502 (1854); *Haywood, etc., Plank-Road Co. v. Bryan*, 51 N.C. 82 (1858) (proxies thrown aside as useless after meeting); *Pollock v. Wilcox*, 68 N.C. 46 (1873); *Cleveland-Akron Bag Co. v. Messick Grocery Co.*, 171 N.C. 764 (1916).  *Cf. Coxe v. Skeen*, 25 N.C. 443 (1843) (copy of book account, original of which destroyed in regular course, rejected).

[79] Plaintiff's citation to *Avello v. SEC*, 454 F.3d 619, 627 (2006) is misguided.  The rule at issue in this case, NASD Conduct Rule 2110, requires evidence of bad faith or unethical behavior absent violation of another rule.  *In the Matter of the Application of Chris Dinh Hartley*, 2004 SEC LEXIS 1507, *9-10, n. 13. This rule, however, is not helpful as it does not define a violation of an SEC rule as a *per se* act of bad faith.

the contents of a writing when the original writing is available. *Investors Title Ins. Co. v. Herzig*, 330 N.C. 681, 693-94 (N.C. 1992).

[51]     Every writing sought to be admitted must be properly authenticated. *Herzig*, 330 N.C. at 693. N.C. Rul. Evid. 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Herzig*, 330 N.C. at 603. The law does not require that a party witness a signature to authenticate a document containing that signature. N.C. Rul. Evid. 901(b)(2).

[52]     With regard to Plaintiff's amendment to her Complaint, in which she contests authenticity of the alleged client agreement, North Carolina courts hold, as a general rule, that "an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (2001), quoting *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 162 (2d Cir. 2000) and citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1476 (2d ed. 1990) ("A pleading that has been amended . . . supersedes the pleading it modifies. . . . Once an amended pleading is interposed, the original pleading no longer performs any function in the case. . . ."). However, in North Carolina:

> "[p]leadings of the second class, while not defining issues in the case being litigated, nevertheless reflect something which a party once said . . . and qualify as evidentiary admissions. This class includes: pleadings (or their equivalent) in the same case which, though once serving to define issues, have been withdrawn, amended to strike out admissions, or otherwise superseded; admissions in other pleadings in the same case . . . ."
>
> 2-8 Brandis and Broun on North Carolina Evidence, § 209.

For example, in a civil action to recover for services rendered where an amendment to a complaint had been allowed and filed by the plaintiff, the court determined that the allegations in the original complaint when contradictory to the plaintiff's position at trial are competent evidence when relevant. *Kabatnik v. Westminster Co.*, 71 N.C. App. 758, 761 (1984), citing *Morris v. Bogue Dev. Corp.*, 194 N.C. 279 (1927). Here, the statements in the original Complaint with regard to the existence of an arbitration agreement between Plaintiff and certain Defendants constitutes some inferential evidence adverse to Plaintiff's position on the arbitration issue as reflected in the Amended Complaint, but it is not conclusive.

VI.

CONCLUSION

[53]    An agreement to remove a dispute from traditional methods of dispute resolution to a binding arbitration proceeding, while embraced and favored by the FAA and most courts as a matter of policy, remains a serious matter that involves substantive and material rights of the respective parties. It should be treated as such by the contracting parties.

[54]    It is not necessarily inappropriate for Morgan Keegan to rely upon scanned and electronically stored copies and specimens in proving the existence of an arbitration agreement between it and a client. However, if a party wishes to rely upon such evidence, it must do better than what has been presented here. Morgan Keegan's record keeping with regard to its Exhibit A, the contended client agreement, was sloppy and fragmented at best. Consequently, the documentary evidence submitted by the moving Defendants was so problematic as to be inconclusive. Accordingly, it is not

persuasive on the issue of existence of an agreement to arbitrate between Morgan Keegan and Capps.

[55]    With regard to non-documentary evidence, the two witnesses best able to testify now to the factual question of whether Capps actually executed a client agreement containing a binding arbitration provision are Capps and Blondeau.  Both of them are highly suspect as witnesses, and the court does not find them credible. Consider:

a.    Capps has had a progressive decline in her memory since 2001.  In 2005, she was diagnosed with dementia, most likely due to Alzheimer's Disease. Her deposition was taken in July, 2008 and is inherently unreliable.

b.    Blondeau recently was convicted, upon a guilty plea, of the very felonious actions with regard to Capps' asset estate that are being complained of in the Plaintiff's Complaint.  His personal interest in this matter is obvious, and his testimony is unreliable.

c.    It is not disputed that Capps usually did not read documents submitted to her by Blondeau.  Rather, he ordinarily hurried Capps in signing papers, and generally did not explain documents to her.

[56]    Whether considered collectively or separately, the documentary evidence submitted by the Defendants and the testimony of Capps and Blondeau is not persuasive on the threshold issue of whether there existed an arbitration agreement between Capps and Morgan Keegan.  Defendants have not propounded other probative and material evidence on the issue.

[57] Accordingly, upon due consideration of all the evidence offered by the moving Defendants, the court is forced to find that Defendants have not carried their burden of proof on the issue of whether there existed a written arbitration agreement between Capps and Morgan Keegan. Consequently, the Defendants' Motion should be denied.

[58] In view of this ruling, further analysis of the respective contentions raised by the parties relevant to the Motions is not required.

[59] NOW THEREFORE, based upon the foregoing, it is ORDERED that the motions to stay judicial proceedings and to compel arbitration propounded in this matter by Defendants Harold Earl Blondeau and Morgan Keegan & Company, Inc. are DENIED. This action shall proceed accordingly.

This the 13th day April, 2010.