Cold Springs Ventures, LLC v. Gilead Sci., Inc., 2015 NCBC 1.

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1873

| | | |
|---|---|---|
| COLD SPRINGS VENTURES, LLC, a North Carolina Limited Liability Company; JAMES M. STRATHMEYER; and BRUCE J. BOEHM, <br>        Plaintiffs <br><br>       v. <br><br> GILEAD SCIENCES, INC.; a California Corporation; L. ERIC HALLMAN; DOUGLAS BAKER; and NEIL JONES, <br>        Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER ON DECLARATORY ACTION TO STAY ARBITRATION** |

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, came before the Court for hearing upon Plaintiffs' Declaratory Action to Stay Arbitration ("Motion"), contained in their Amended Complaint;[1] and

THE COURT, after reviewing the Motion, briefs in support of and in opposition to the Motion, arguments of counsel, and other appropriate matters of record, FINDS and CONCLUDES that:

---

[1] *See* Am. Compl. ¶¶ 135-140, 141 (b)-(c). Plaintiffs' First Cause of Action is functionally the same as a G.S. 1-569.7(b) motion to stay arbitration and is treated as such.

<u>Background</u>

1.     Defendant Gilead Sciences, Inc. ("Gilead") has joined Plaintiffs[2] as respondents in an arbitration action ("Arbitration") pending before the American Arbitration Association ("AAA").[3]

2.     Plaintiffs are former investors, shareholders, and directors of Old Kryo, Inc. ("NC Kryo"),[4] a North Carolina corporation. In September 2010, NC Kryo entered into a contract with Gilead ("Gilead Contract"), which contained a mandatory arbitration clause.[5] In March 2011, NC Kryo entered into an agreement ("Kryo Transaction") to sell all or substantially all of its assets and business to Kryosphere, Inc. ("GA Kryo"), a Georgia corporation.[6] As part of the Kryo Transaction, NC Kryo purportedly assigned the Gilead Contract to GA Kryo.[7] Gilead contends that NC Kryo did not obtain prior written consent from Gilead for the assignment of the Gilead Contract to GA Kryo as required under the Gilead Contract.[8] NC Kryo was subsequently dissolved.[9] In October 2013, Gilead initiated the Arbitration against GA Kryo and the Plaintiffs for alleged breach of the Gilead Contract.[10]

3.     Although Plaintiffs did not sign the Gilead Contract, they have been named as respondents in the Arbitration. Gilead contends that Plaintiffs committed fraud,

---

[2] In addition to the remaining Plaintiffs in this action, Gilead named as respondents in the arbitration Commonwealth Ventures, LLC, Endeavors Venture, and Jeannie Mullen. These former Plaintiffs voluntarily dismissed all claims asserted in this action with prejudice on June 16, 2014. Gilead additionally named in the arbitration proceeding Kryosphere, Inc., L. Eric Hallman, Douglas Baker, Neil Jones, Michael J. Schierbeek, John O. Norton, Patrick Norton, and Ryan Norton. These parties were dismissed from this action by Court Order on November 18, 2014.
[3] Am. Compl. ¶¶ 79-80.
[4] *Id.* ¶¶ 1-6.
[5] Ex. A to Am. Compl.
[6] *Id.* ¶¶ 55, 59.
[7] *See id.* ¶ 68.
[8] *See id.*; Pls.' Mem. Supp. Req. Prelim. Inj. ("Pls.' PI Br.") at 5; Gilead Contract.
[9] Am. Compl. ¶ 63.
[10] *Id.* ¶ 79; Ex. B to Am. Compl. ("Arbitration Demand").

depleted NC Kryo's resources and are in substance the alter ego of NC Kryo. Gilead argues that Plaintiffs' actions and relationship with NC Kryo would expose Plaintiffs to liability to Gilead under the instrumentality rule even though Plaintiffs were not signatories to the Gilead Contract or any other arbitration agreement.[11] Plaintiffs concede that they could be compelled to participate in the Arbitration if they are liable under the instrumentality rule.[12] Plaintiffs contend, however, that Gilead has not sufficiently shown misconduct on Plaintiffs' part as investors and directors of NC Kryo that would subject them to such liability. Plaintiffs therefore brought this civil action seeking declaratory and injunctive relief from this Court.

4.      On Tuesday, March 4, 2014, the Court heard Plaintiffs' requests for temporary, preliminary, and permanent injunctive relief ("Injunction Motions").[13] In its March 26, 2014, Amended Order on Motion for Preliminary Injunction and Notice of Hearing ("Preliminary Order"),[14] the Court chose to treat the Injunction Motions as preliminary requests pending a determination of Plaintiffs' Declaratory Judgment Claim, which the Court determined should be treated as a motion to stay arbitration pursuant to G.S. 1-569.7 ("Declaratory Action to Stay Arbitration").[15] In the Preliminary Order, the Court found and concluded that a determination over the arbitrability of the dispute between the Parties is within the province of the Court, subject to the restriction that the Court refrain from impermissibly considering the dispute's underlying merits.[16] The Court also concluded that this dispute is governed by both the Federal Arbitration Act ("FAA"), 9

---

[11] *See* Arbitration Demand.
[12] Pls.' PI Br. at 14.
[13] *See* Am. Compl. ¶¶ 153-160.
[14] *Cold Springs Ventures, LLC v. Gilead Sciences, Inc.*, 2014 NCBC 10 (N.C. Super. Ct. 2014).
[15] Preliminary Order at 14-15 ¶¶ 24-25. That is, the Injunction Motions were treated as motions to temporarily stay the Arbitration pending final resolution of the arbitrability dispute.
[16] *Id.* at 11, 13 ¶¶ 18, 21.

USC § 1 *et seq.*, and North Carolina's Revised Uniform Arbitration Act ("NCRUAA"), G.S. 1-569.1 *et seq.* More specifically, the NCRUAA governs the procedural aspects of this dispute, while the FAA governs with regard to substantive issues. The Court's Preliminary Order resolved the issues raised by Plaintiffs' Injunction Motions, provided a short discovery period related to the Declaratory Action to Stay Arbitration, and noticed the same for hearing.[17] On Friday, December 5, 2014, the Court heard Plaintiffs' Declaratory Action to Stay Arbitration.

Procedure

5.      At the December 5, 2014, hearing, the Parties continued to manifest a fundamental disagreement on the procedural contours of a G.S. 1-569.7(b) inquiry in this matter and under these facts.

6.      G.S. 1-569.7(b) requires courts presented with a motion to stay arbitration to "proceed summarily to decide . . . if there is an enforceable agreement to arbitrate." As noted in the Preliminary Order, the exact procedural setting contemplated by the statute's requirement of summary determination is not immediately apparent. Plaintiffs, however, correctly observe that the statute and relevant case law taken together establish that the Court is required to make finding facts in order to determine whether an "enforceable agreement to arbitrate" exists which may involve conducting the equivalent of a non-jury trial. *See Cornelius v. Lipscomb*, __ N.C. App. __, __, 734 S.E.2d 870, 871 (2012) (Court of Appeals has "repeatedly held" that order denying motion to compel arbitration must include

---

[17] Plaintiffs' First Cause of Action contains a prayer for declaratory relief on three separate issues. *See* Am. Compl. ¶ 141 (a)-(c). As noted in the Preliminary Order, the Declaratory Action to Stay Arbitration includes only the relief sought in subsections (b) and (c) of that paragraph. For reasons discussed at length in the Preliminary Order as well as below, the court cannot properly consider the relief sought in Am. Compl. ¶ 141(a), which seeks a broad declaration that "there is no legal or factual basis for Gilead to pierce the [NC Kryo] corporate veil against [Plaintiffs] with regard to the Gilead Contract."

findings of fact as to arbitrability); *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268 (1992) (*Routh II*) (After remand due to trial court's failure to summarily determine whether valid agreement to arbitrate exists, trial court properly held "non-jury trial" and made findings of fact in order determine motion to compel arbitration); *Blow v. Shaughnessy*, 68 N.C.App. 1, 18 (1984), *disc. review denied*, 311 N.C. 751 (1984) (trial court in motion to stay proceedings and compel arbitration was "sitting as the trier of fact"); *Capps v. Blondeau*, 2010 NCBC 7 n. 6 (N.C. Super. Ct. 2010) ("[I]n determining the threshold issue of whether a mandatory arbitration agreement exists, the court necessarily must sit as a finder of fact. Accordingly, for such limited purpose, the court also may consider evidence as to facts that are in dispute.") (citing *Slaughter v. Swicegood*, 162 N.C. App. 457, 461 (2004)); *see also Routh v. Snap-On Tools Corp.*, 101 N.C. App. 703, 706 (1991) (*Routh I*) (Inappropriate under predecessor statute to G.S. 1-569.7 for judge to apply "a summary judgment standard of whether there was a 'genuine issue of material fact'").

7.      While G.S. 1-569.7(b) requires summary determination and perhaps even the equivalent of a bench trial, the Court is simultaneously faced with the obligation to avoid impermissible entanglement in the underlying merits of a potentially arbitrable dispute. *See, e.g.*, *AT&T Techs.*, 475 U.S. at 649 ("[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."), G.S. 1-569.7(d) (A court should not refuse to compel arbitration "because the claim lacks merit or because grounds for the claim have not been established"). This dispute poses a unique tension because deciding "summarily" the question of arbitrability necessarily involves consideration of issues very similar to those involved in the merits of Gilead's instrumentality claim against Plaintiffs in the underlying arbitration.

8.      In order to resolve this tension, Gilead urges the Court to follow the Fourth Circuit's jurisprudence in *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988), *Long v. Silver*, 248 F.3d 309 (4th Cir. 2001), and *Smith v. Cato*, 2006 U.S. Dist. LEXIS 31935 (W.D.N.C. May 9, 2006). The *Cato* court interpreted *J.J. Ryan*, *Long*, and other Fourth Circuit precedent as having

> carved an exception to the rule that a party should not be compelled to arbitrate claims which he has not agreed to arbitrate, where (1) the allegations against a non-signatory and a signatory are based on the same facts, and are inherently inseparable or closely intertwined; and (2) the non-signatory exercises substantial control over the signatory's activities.

*Cato*, 2006 U.S. Dist. LEXIS 31935 at *20.

9.      Gilead takes the position that the Court should disregard the requirements of G.S. 1-569.7 and apply a federal standard[18] using the formulation created by the court in *Cato*.  Defendants take the position that the *Cato* standard is "more demanding than a motion to dismiss under Rule 12(b)(6), but less demanding than a motion for summary judgment because it requires more than a mere allegation that [Plaintiffs] are subject to the arbitration agreement, but stops short of requiring Gilead to demonstrate that it is entitled to judgment as a matter of law."[19]  While it is clear that this Court is not to apply a summary judgment standard to its decision, G.S. 1-569.7 does require the Court to make findings of fact and reach a determination as to whether an enforceable agreement to arbitrate exists.  This a task wholly different than deciding a motion to dismiss or a motion for summary judgment, and not inconsistent with the approach taken by the federal court

---

[18] It is not entirely clear how application of a federal standard would benefit Gilead here since the federal analogue to G.S. 1-569.7 requires a "trial" on the issue of arbitrability and even provides for a jury trial where that right is asserted. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.").  Accordingly, this Court inevitably must make findings of fact that necessarily will touch on the veil-piercing theory raised by Gilead in the underlying arbitration.

[19] Gilead Mem. Opp'n Pls.' Declaratory Action Stay Arbitration (May 19, 2014) ("Gilead Brief") at 13-14 (emphasis added).

in *Cato*. Accordingly, the Court does not interpret the *Cato* standard as being inconsistent with application of the G.S. 1-569.7 requirements.

10.    The Court CONCLUDES that it should summarily decide the question of whether an enforceable agreement to arbitrate exists between Plaintiffs and Gilead under G.S. 1-569.7.[20] The Court's inquiry, undertaken for the limited purpose of determining whether the facts establish that Plaintiffs were parties to an enforceable agreement to arbitrate, will not constitute a final judgment on the merits of Gilead's veil-piercing/instrumentality claim raised in the arbitration. This decision will not have collateral estoppel or res judicata consequences,[21] and as such does not contravene the relevant public policy underlying the court's obligation to refrain from ruling on the merits of a dispute.[22]

11.    Having determined that a full G.S. 1-569.7 inquiry is the proper form of analysis in this case, the Court, solely for the purpose of determining the Motion, makes the following FINDINGS OF FACT and CONCLUSIONS OF LAW.

FINDINGS OF FACT

12.    Plaintiff Bruce J. Boehm ("Boehm") was an individual investor and director of NC Kryo.[23] Boehm invested over $190,000 in NC Kryo. At all relevant times, Boehm was a

---

[20] However, even if the Court were inclined to follow the reasoning of *Cato*, as discussed below, the Court finds that an analysis under *Cato* yield the same result.

[21] *See Thomas M. McInnis & Associates, Inc. v. Hall*, 318 N.C. 421, 428 (1986) (*res judicata* requires "a final judgment on the merits in a prior action"), *Bee Tree Missionary Baptist Church v. McNeil*, 153 N.C. App. 797, 799 (collateral estoppel requires the same).

[22] *Cf. MAG Portfolio*, 268 F.3d 58 (Second Circuit vacated district court's order compelling arbitration and remanded matter to district court "for an evidentiary hearing on the question of whether the corporate veil . . . should be pierced in order to compel arbitration" because the instrumentality rule demands a "very fact specific inquiry involving a multitude of factors" and the record lacked "sufficient fact finding to support affirmation based on a veil-piercing theory").

[23] Am. Compl. ¶¶ 31, 38.

member of the Board of Directors of NC Kryo but did not hold any position as an officer of that company.

13.    Plaintiff James M. Strathmeyer ("Strathmeyer") was an individual director of NC Kryo. Strathmeyer was not an individual investor in NC Kryo.[24]

14.    Plaintiff Cold Springs Ventures, LLC ("Cold Springs"), is a North Carolina limited liability company whose sole member is Strathmeyer. Cold Springs was an investor in NC Kryo.[25] Cold Springs invested over $180,000 in NC Kryo.

15.    NC Kryo was formed to store and manage various biomaterials, including clinical trial samples. NC Kryo and Gilead entered into a Master Services Agreement ("Gilead Contract"), effective September 1, 2010, whereby NC Kryo agreed to store and manage material belonging to Gilead. The Gilead Contract contained a non-assignment provision, limiting the ability to transfer the agreement without the consent of the other party, and an arbitration clause, which required submission of any dispute arising under the Gilead Contract to arbitration with the AAA. The Gilead Contract was executed on behalf of NC Kryo by L. Eric Hallman ("Hallman"), NC Kryo's Chief Executive Officer. [26] There is no evidence in the record that Plaintiffs participated in the negotiation, or even were aware of the existence, of the Gilead Contract.

16.    At various times in the operation of NC Kryo, the company operated with vacancies on its Board of Directors and in officer positions.[27] At no time in NC Kryo's corporate history did it ever fill all five seats on the Board of Directors.[28]

---

[24] Am. Compl. ¶¶ 35, 38.
[25] Am. Compl. ¶¶ 1, 4, 32.
[26] Ex. A to Am. Compl.
[27] Boehm Depo. 61:20-23.
[28] *Id.*

17. In their role as directors, Boehm and Strathmeyer participated actively in soliciting funding for NC Kryo and were routinely apprised of the financial condition of that company by its officers.[29] As to the financial condition of the company, Boehm acknowledged that NC Kryo "was always insolvent" and was "never a going concern."[30]

18. While serving as directors, Boehm and Strathmeyer terminated officers,[31] approved reimbursements to other directors,[32] and actively participated in arranging either a liquidation or acquisition of NC Kryo.[33] During its operation, minutes of meetings of directors of NC Kryo were routinely kept.[34] However, no minutes have been produced from any meeting wherein the termination of Eric Hallman as Chief Executive Officer was discussed or authorized by the Board of Directors.

19. Subsequent to the execution of the Gilead Contract, and due to the financial condition of the company, NC Kryo's Board of Directors elected to wind down or sell NC Kryo. Boehm, Strathmeyer, and Hallman[35] voted in favor of winding down NC Kryo, while Douglas Baker ("Baker") abstained.[36]

20. In late 2010, NC Kryo entered into negotiations with John Norton ("Norton") to purchase NC Kryo's assets and liabilities ("Kryo Transaction"). These negotiations culminated in the drafting of an Asset Purchase Agreement whereby NC Kryo's assets would be sold for a cash sum in addition to the assumption of NC Kryo's liabilities. When the Kryo Transaction was approved, by both the Board of Directors and the shareholders of

---

[29] Ex. M to Gilead Brief.
[30] Boehm Depo. 89:5-7.
[31] Boehm Depo. 75:8-10.
[32] Ex. FF to Gilead Brief.
[33] Ex. M to Gilead Brief.
[34] *See, e.g.,* Ex. M to Gilead Brief, Ex FF to Gilead Brief.
[35] Prior to this meeting, Hallman was terminated as Chief Executive Officer of NC Kryo, but remained a director until March 2011.
[36] Ex. M to Gilead Brief.

NC Kryo, Boehm and Strathmeyer were the sole directors of NC Kryo. To facilitate approval of the Kryo Transaction, Boehm and Strathmeyer, as sole directors, appointed a number of individuals to fill vacancies in officer positions.[37] Following the execution of the Kryo Transaction, NC Kryo was dissolved.[38] It is undisputed that Boehm and Cold Springs lost their entire investments in NC Kryo.

21.     In 2013, Gilead performed an audit GA Kryo's performance under the Gilead Contract.  The audit revealed that GA Kyro, and previously NC Kryo, had failed to adequately perform their obligations  and had breached the Gilead Contract.[39] On the basis of the results of the 2013 audit, Gilead initiated the Arbitration.[40]

CONCLUSIONS OF LAW

22.     In North Carolina, "[t]he general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438 (2008). However, in proper circumstances a court can look behind the corporate form and disregard the corporation's separate and independent existence. *Id.* at 438-39. Our appellate courts have repeatedly cautioned that disregarding the corporate form, or piercing the corporate veil, is a remedy that "should be invoked only in an extreme case where necessary to serve the ends of justice." *Dorton v. Dorton*, 77 N.C. App. 667, 672 (1985).

23.     "Piercing the corporate veil . . . allows a plaintiff to impose legal liability for a corporation's obligations, or for torts committed by the corporation, upon some other company or individual that controls and dominates a corporation." *Green v. Freeman*, 367 N.C. 136,

---

[37] *See* Ex. J to Gilead Brief.
[38] *See* Boehm Depo. 27:22-23.
[39] Ex. V to Gilead Brief.
[40] *See* Ex. B to Am. Compl.

145 (2013). The purpose of piercing the corporate veil is to prevent the use of the corporate form for some fraudulent purpose, or to accomplish an unconscionable result. *See Ridgeway Brands Mfg., LLC*, 362 N.C. at 438.

24. In order to pierce the corporate veil a party must show "that the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." *Green*, 367 N.C. at 145. This "instrumentality rule" inquiry involves three elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 145-46 (internal citations omitted).

25. Factors relevant to the Court's instrumentality rule analysis include "inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Id.* (internal citations omitted).

### Element 1: Complete Domination and Control

26. Turning to the case at bar, Gilead contends that Plaintiffs so controlled and dominated NC Kryo that the Court should disregard the corporate form and compel Plaintiffs to arbitrate. More specifically, Gilead focuses on four key factors in support of its contention that the Court should pierce the corporate veil in this case. First, Gilead contends that Plaintiffs had domination and control over NC Kryo's affairs. Second, NC Kryo failed to follow

corporate formalities and had non-functioning officers and directors, or vacancies in those positions. Third, Gilead contends that NC Kryo's financial condition supports veil piercing. Finally, Gilead argues that the use of NC Kryo funds to repay personal expenses justifies disregarding the corporate form. The Court will address each of these contentions in turn.

*Domination and Control over NC Kryo*

27.     Gilead's first contention in support of their position that the Court should pierce NC Kryo's corporate veil and compel Plaintiffs to arbitrate is that Plaintiffs had sufficient domination and control over NC Kryo to support disregarding that entity's corporate form.

28.     The complete domination and control of a corporation is a critical, if not the most critical, element in a court's veil piercing analysis. *See generally Green*, 367 N.C. at 145-46. Control, for the purpose of a veil piercing analysis, means "complete domination, not only of finances, but of policy and business practice . . . so that the corporate entity . . . had at the time no separate mind, will or existence of its own . . . ." *Green*, 367 N.C. at 145 (internal citations omitted). Ownership of a corporation, and even participation in the management of the corporation, is not sufficient control to satisfy the instrumentality rule. *See Waff Bros., Inc. v. Bank of North Carolina, N.A.*, 289 N.C. 198, 210 (1976) (recognizing that ownership of all outstanding stock of two corporations by a single person who served as chief executive officer of both corporations did not destroy their corporate identities).

29.     To begin, as Plaintiffs note, Gilead does not at all contend that Plaintiff Cold Springs was directly engaged in the control of NC Kryo, though one corporation can be sufficiently dominated and controlled by another. *See B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8 (1966). Gilead instead appears to argue that Plaintiff Cold Springs should be required to arbitrate based on the control over NC Kryo exerted by Cold Springs' sole

member, Strathmeyer.[41] In doing so, Gilead asks this Court to disregard not only NC Kryo's corporate form, but also that of Cold Springs in order to hold that company liable for the actions of its member. While North Carolina law recognizes this type of "reverse veil piercing," *see Strategic Outsourcing, Inc. v. Stacks*, 176 N.C. App. 247, 254 (2006), Gilead has not provided any evidence that would support doing so in this case. Absent evidence that Cold Springs exercised control over NC Kryo, Gilead has not satisfied its burden under the instrumentality rule and the Arbitration, as it pertains to Plaintiff Cold Springs, LLC, should be STAYED.

30.     Turning to Boehm and Strathmeyer, Gilead argues that the following facts support finding that those individuals exercised "complete domination" and control over NC Kryo: (i) Boehm was instrumental in the creation of NC Kryo and became the first non-founding member of the Board; (ii) Strathmeyer suggested a plan for acquiring bridge financing in April 2010, at the same time it was decided that the company would need to be sold or wound down, that resulted in his election as a director; (iii) Strathmeyer terminated Eric Hallman from his position as CEO; (iv) Boehm and Strathmeyer voted in favor of the decision to wind down NC Kryo or sell its assets; (v) Boehm negotiated the terms of the sale to GA Kryo; (vi) Boehm and Strathmeyer orchestrated and approved the execution of the Kryo Transaction; (vii) Strathmeyer participated in the installation of officers prior to the closing of the Kryo Transaction; and (viii) the structure of the Board and the lack of any outside director enabled Boehm and Strathmeyer to exert control over the company.[42]

---

[41] In its Reply Brief, Gilead also argues that Cold Springs' "financial influence" justifies a finding that Cold Springs exercised control over NC Kryo. Reply Br. (May 30, 2014) p. 7. In support of this position, however, Gilead directs the Court to actions that were undertaken by Strathmeyer. *Id.* at 7-8. While Strathmeyer's involvement in NC Kryo was due to the investment of Cold Springs, Gilead has not shown that Cold Springs was anything but a passive investor after Strathmeyer's election to the Board.

[42] *See* Gilead Brief pp. 17-19. Many of these facts appear to the Court to be undisputed. *See* Gilead Reply Brief p. 2.

31.     These facts, however, do not demonstrate that Boehm and Strathmeyer had such complete and total control of NC Kryo as to render that company devoid of any "separate mind, will, or existence of its own." *Green*, 367 N.C. at 145. As directors, Boehm and Strathmeyer were charged with overseeing and directing the operation of NC Kryo. Statutorily, directors of North Carolina business corporations are charged with exercising, or directing the exercise of, all corporate powers. G.S. § 55-8-01(b). Gilead's argument regarding the control exercised by Boehm and Strathmeyer is based almost entirely on actions taken by those individuals pursuant to their statutory authority as directors. For example, Gilead contends that Boehm and Strathmeyer made the decision to wind down, or dissolve, NC Kryo and that this decision should support piercing the corporate veil. Pursuant to G.S. § 55-14-02, however, a corporation's board of directors may propose dissolution for submission to the company's shareholders. Therefore, the fact that Boehm and Strathmeyer, acting as directors of NC Kryo while participating in a meeting of the Board of Directors for which minutes were recorded,[43] each voted in favor of recommending dissolution does not support Gilead's contention that the corporate veil should be pierced.

32.     Undoubtedly, Boehm and Strathmeyer exercised control over NC Kryo. Indeed, it is undisputed that, at least for a period of time, Boehm and Strathmeyer were the only two directors of that company. However, Gilead has not shown that such control rose to the level of "complete domination" as required to pierce NC Kryo's corporate veil and compel those individuals to arbitration. Gilead has not shown that Boehm and Strathmeyer exceeded their role as directors by directing the day-to-day operations of NC.

33.     In sum, while Boehm and Strathmeyer certainly exercised control over NC Kryo, the record before the Court indicates that the control exercised by those directors does

---

[43] *See* Ex. M to Gilead Brief.

not rise to the "complete domination" of corporate policy, finances, and practices necessary to support disregarding the corporate form in this action.

*Failure to Follow Corporate Formalities*

34.    Gilead next contends that the failure of NC Kryo, and its directors Boehm and Strathmeyer, to follow corporate formalities, especially in NC Kryo's final days, justifies piercing the corporate veil and compelling Plaintiffs to arbitration.

35.    North Carolina courts are more likely to pierce the corporate veil when the principals of a corporation make "no effort to keep, or pretense of keeping, [their] interest[s] and activities separate and apart from those of the corporation." *Henderson v. Security Mortg. & Finance Co.*, 273 N.C. 253, 260 (1968). Examples of failures to follow corporate formalities weighing in support of piercing the corporate veil include the failure to hold an organizational meeting or issue shares, *Keels v. Turner*, 45 N.C. App. 213, *cert. denied*, 300 N.C. 197 (1980), commingling of personal and corporate funds and a failure to formally keep corporate records, including corporate minutes, *Monteau v. Reis Trucking & Constr., Inc.*, 147 N.C. App. 121 (2001), and the transfer of funds to other entities or individuals without formal debt instruments or any other formal records, *Atlantic Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 166 (1990). However, noncompliance with corporate formalities, standing alone, is insufficient to justify disregarding the corporate form. *Hoots v. Toms & Bazzle, P.A.*, 100 N.C. App. 412, 419 (1990).

36.    Here, Gilead contends that NC Kryo failed to keep minutes on several occasions, including an April 2010 Board meeting wherein the plan to wind down the company was discussed,[44] and when the Board approved, if it ever did, the termination of Eric Hallman as Chief Executive Officer. Additionally, Gilead argues that NC Kryo, and

---

[44] Though minutes were kept for the meeting wherein the decision to wind down NC Kryo was actually put to a vote. *See* Ex. M to Gilead Brief.

specifically Boehm and Strathmeyer, failed to fill officer and director positions as they came open, and that, when positions were filled, corporate titles were not taken seriously. Only when it came to closing the Kryo Transaction, Gilead contends, did the Board appoint a full complement of corporate officers. Finally, Gilead contends that the approval of the Kryo Transaction by the shareholders of NC Kryo was "tainted" by the failure to follow corporate formalities in that the shareholders were not provided with all material information regarding the transaction. In support of this final contention, Gilead adds that "there is no indication that those shareholders who asked for a complete copy [of the asset purchase agreement] were provided it."

37.     On the evidence presented by the parties, the Court cannot conclude that, on the whole, NC Kryo, by and through Boehm and Strathmeyer, failed to adequately maintain corporate formalities. It does appear that at least one Board meeting, possibly more, lacked adequate record keeping, and that NC Kryo operated with vacancies on its Board and in corporate offices. While the Court acknowledges the record reveals that, at times, it appears that record keeping was not the highest priority for NC Kryo, the evidence presented by Gilead does not rise to the level that North Carolina appellate courts have required to support invocation of the instrumentality rule. Missing from Gilead's argument is any evidence that Boehm and/or Strathmeyer commingled personal funds with NC Kryo funds, transferred NC Kryo funds between company accounts and personal accounts without formal records, failed to properly adopt by-laws, or failed to issue shares.

38.     The inadequacies in record keeping identified by Gilead are not as systemic as in cases where failure to maintain corporate formalities has been a factor favoring veil piercing. As such, this factor, the failure to maintain corporate formalities, does not weigh in favor of piercing the corporate veil of NC Kryo.

*NC Kryo's Financial Condition*

39.     Gilead next claims that because NC Kryo was "always insolvent," the Court should pierce the corporate veil and compel the Plaintiffs to arbitration. In the instrumentality rule analysis, however, courts distinguish between inadequate capitalization borne out of deception or fraud, *see Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 653 (2009) (where corporation's principal allegedly transferred assets "for the purpose of avoiding payment" of a debt), and inadequate capitalization "arising simply out of a lack of funds available for contribution to the enterprise." Russell M. Robinson II, *Robinson on North Carolina Corporation Law* § 2.10[2] (hereinafter "*Robinson*").

40.     Here, the record before the Court indicates that, while NC Kryo did suffer from "inadequate capitalization" in the most literal sense, NC Kryo's financial condition was not the product of fraud or deception, but was due instead to NC Kryo's circumstance as a start-up company struggling to raise capital. The record indicates that NC Kryo made multiple attempts to secure operating capital, including those that resulted in the Plaintiffs' investment in the company. Gilead does not direct the Court to any evidence in the record that indicates NC Kryo's financial condition was a result of fraud or other improper conduct on the part of Plaintiffs, such as using corporate funds for their personal benefit. Instead, Gilead contends that NC Kryo's "congenital insolvency" supports its veil piercing claim. However, the mere fact that NC Kryo's capitalization efforts did not ultimately yield enough capital for the company to survive should not, without more, support the drastic remedy of disregarding the corporate form.

*Use of Corporate Funds for Personal Reimbursement*

41.     Gilead's final factor in support of piercing NC Kryo's corporate veil is that NC Kryo directors, specifically Plaintiffs Boehm and Strathmeyer, approved a $5,000 payment to Eric Hallman for "personal expenses."

42. One of the factors cited in *Green* in support of disregarding the corporate form is the siphoning of corporate funds by the dominant shareholder. In that case, corporate funds were used "to pay personal expenses, such as home mortgage and utility bills." *Green*, 367 N.C. at 145. Similarly, in *Fischer Investment Capital, Inc.*, the Court of Appeals held that the plaintiff stated a claim for piercing the corporate veil where plaintiff alleged, among other things, that the principal of the defendant, Mark Lewis, siphoned corporate funds for his own benefit. *Fischer Inv. Capital, Inc.*, 200 N.C. App. at 652.

43. At the outset, the Court recognizes the situation at bar differs slightly from those, such as *Green*, in which using corporate funds for personal purposes has been a key factor supporting the application of the instrumentality rule. Here, Gilead does not contend that Boehm and Strathmeyer used their positions as directors to transfer corporate funds to themselves for their personal benefit, but, rather, to benefit another director, Eric Hallman.[45] Nevertheless, Gilead maintains that the approval of the payment to Eric Hallman can support its veil piercing argument.

44. It is undisputed that Boehm and Strathmeyer, in their role as directors of NC Kryo, voted to approve the $5,000 payment to Eric Hallman. However, the evidence presented by Gilead does not necessarily support the claim that these expenses were "personal," as those in *Green*, and not genuine business expenses. The minutes from the February 8, 2011, Board meeting in which the reimbursement was approved reflect that these expenses were considered "reimbursable."[46] Moreover, in opposition to Plaintiff's Declaratory Action, Gilead submitted an e-mail exchange involving Michael J. Schierbeek, then Chief Financial Officer of NC Kryo, that reflects that the expenses submitted by Eric Hallman were the subject of at

---

[45] *See* Gilead Brief p. 22.
[46] Exhibit FF to Gilead Brief.

least some discussion among the directors and officers regarding whether they were reimbursable.[47]

45.     Simply stated, it is unclear based on the record before the Court that the payment to Eric Hallman for expenses incurred was truly a "siphoning of corporate funds" as occurred in *Green*, or as was alleged in *Fischer Investment Capital*. As such, the reimbursement of funds does not necessarily support the drastic remedy of disregarding NC Kryo's corporate form.

46.     In sum, the record before the Court clearly indicates that Boehm and Strathmeyer controlled NC Kryo. However, the control exerted by those individuals does not rise to the level of "complete domination" required to support piercing the corporate veil.

### Elements 2 and 3: Control Used to Perpetrate a Wrong, Proximately Causing Gilead's Injuries

47.     The exercise of domination and control over the corporation is a "threshold" requirement for piercing the corporate veil. *See Atlantic Tobacco Co. v. Honeycutt*, 101 N.C. App. at 165. Here, having found that the evidence before the Court fails to establish that Plaintiffs dominated and controlled NC Kryo, "it is not possible to proceed to the further issues of whether that control was used to perpetrate a wrong, or whether the control proximately caused [Gilead's] injuries." *Id.*[48]

### *Cato* Analysis

48.     Having already found that a full G.S. 1-569.7 inquiry is the proper method of analysis in this matter, the Court will nevertheless address Gilead's contention that application of the Fourth Circuit standard, as stated in *Smith v. Cato, supra*, would lead to different result.  In *Cato*, the plaintiff entered into a "complex business and multifaceted

---

[47] Exhibit CC to Gilead Brief.
[48] The Court also notes that Gilead did not present any evidence that Boehm or Strathmeyer took any action with the express intent of defrauding Gilead or any other customer or creditor.

contractual relationship", including an employment agreement, with Cato Enterprises, LLC, and Cato Management, LLC ("Cato Entities"). 2006 U.S. Dist. LEXIS 31935, **2-3. The employment agreement contained an arbitration clause. Wayland H. Cato, Jr. ("Defendant") was the manager of both of the Cato Entities. *Id.* at *2. Defendant "personally negotiated" the integrated business agreement with plaintiff, and signed the employment agreement in his capacity as manager of the Cato Entities, but not in his individual capacity. *Id.* at **3-4. The Cato Enterprises subsequently terminated the plaintiff, and Cato Entities, the plaintiff and Defendant brought claims against one another in court and under the arbitration clause in the employment agreement. The plaintiff sought to compel Defendant to arbitrate claims brought in the federal court lawsuit under the arbitration agreement in the employment agreement. *Id.* at **6-8. Defendant opposed arbitration on the grounds that he had not signed the employment agreement in his individual capacity, but only as the manager for the Cato Entities and, accordingly wasn't a party to the arbitration agreement. *Id.* at *9.

49.     In *Cato*, the court recognized that "in an appropriate case" a "non-signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." 2006 U.S. Dist. LEXIS 31935, **22-23. The court also held that the Fourth Circuit had created an exception to the general rule that a party could not be compelled to arbitrate claims he has not agreed to arbitrate when "(1) the allegations against a non-signatory and a signatory are based on the same facts, and are inherently inseparable or closely intertwined; and (2) the non-signatory exercises substantial control over the signatory's activities." *Id.* at *20. Applying these factors, the court concluded that the claims being raised by and against the non-signatory, Defendant, and the signatories, Plaintiff and the Cato Entities, were "inherently inseparable and closely intertwined." *Id.* at *22. The Court further held Defendant exercised control over of the Cato Entities as manager, Defendant

"signed the Employment Agreement, which contained an arbitration provision, in his capacity as manager," and also "personally negotiated each component part of the parties integrated business relationship." *Id.* at \*\*21-22. Accordingly, the court held that Defendant should be required to arbitrate.

50. This Court finds on that on the record before it that Gilead has not satisfied the two-prong *Cato* standard. First, in this case, the allegations against Plaintiffs are not based on the same facts, or inherently inseparable or closely intertwined, with the allegations in the underlying arbitration against the signatory to the Gilead Contract, GA Kryo/NC Kryo (hereinafter collectively "Kryo"). In the arbitration, Gilead makes claims arising from the alleged breach of the Gilead contract by Kyro. Gilead alleges, among other things, that Kyro breached the Gilead Contract by improperly storing and recording Gilead's samples, and improperly failed to maintain adequate insurance coverage. Gilead's allegations against Plaintiffs, on the other hand, are aimed at providing a basis for holding someone liable for damages should they prevail on the breach of contract allegations. As discussed at length herein, the allegations against Plaintiff in the arbitration are that they operated NC Kyro as a sham, dominated and controlled its business practices, policies and finances, and used such domination and control to perpetrate a fraud on Gilead. Gilead has made no allegations that Plaintiffs were personally involved in any manner in performing NC Kryo's obligations under the Gilead Contract. Whatever overlap there may be between the issues of whether Kryo breached the Gilead Contract and the veil-piercing or instrumentality allegations against Plaintiffs, they certainly are not "inherently inseparable".

51. Even if Gilead were able to satisfy the first prong of the *Cato* standard, it has not shown that the Plaintiffs, as non-signatories, exercised substantial control over the signatory's activities. Here, as discussed above, Gilead's argument that Plaintiffs controlled

NC Kryo rests almost entirely on Boehm and Strathmeyer's roles as directors.[49] Gilead presented no evidence that Plaintiffs exercised control over the day-to-day operations of NC Kryo as officers or managers. In addition, in *Cato*, that Defendant was intimately involved in negotiating the agreements underlying the claims between the parties, and even signed the agreement on behalf of the Cato Entities. Those types of facts simply are not present in this case where there is no evidence connecting Boehm or Strathmeyer to the Gilead Contract.

52.     Accordingly, even under the *Cato* analysis, Gilead has not shown that Plaintiffs should be compelled to arbitrate with Gilead.

NOW THEREFORE, based on the foregoing FINDINGS and CONCLUSIONS, IT IS ORDERED that:

1.     To the extent that Plaintiffs' Declaratory Action Staying Arbitration requests this Court to find that Plaintiffs are not bound by the arbitration provision in the Gilead Contract, that claim is GRANTED.

2.     As to Plaintiff Cold Springs Ventures, LLC, Plaintiff Bruce J. Boehm, and Plaintiff James M. Strathmeyer, the Arbitration is permanently STAYED, and Defendants are permanently ENJOINED from attempting to arbitrate their claim for breach of the Gilead Contract against Plaintiffs.

3.     Nothing in this Order shall be construed as a ruling on the merits of Defendant Gilead Sciences, Inc.'s instrumentality rule theory, nor shall this Order have any preclusive effect on any subsequent attempt to hold Plaintiffs liable to Gilead under the instrumentality rule.

---

[49] As also noted above, Gilead presents no evidence that Cold Springs exercised any control over NC Kryo.

4.     Except as expressly granted herein, Plaintiffs' Declaratory Action to Stay Arbitration is DENIED.

This the 6th day of January, 2015.